*********** *Page 2 
Based upon the opinion of the Court of Appeals holding that defendant-Erwin Oil Company is a statutory employer pursuant to N.C. Gen. Stat. § 97-19 and remanding the matter to the Commission for additional findings of fact regarding plaintiff's injuries and defendants' liability, the Full Commission enters the following:
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. Plaintiff contends that on August 6, 1999 he suffered a compensable injury by accident during the course of and within the scope of his employment as a cashier at the Tri-Star Amoco Food Shop, when he was shot in the neck during an armed robbery. Defendants deny that plaintiff suffered an injury by accident during the course of and within the scope of his employment.
2. Plaintiff contends that at all times relevant to his claim, Iftikhar Abbasi and Tri-Star Amoco Food Shop regularly employed three or more employees and were bound by and subject to the Workers' Compensation Act.
3. Erwin Oil Company (hereinafter "Erwin Oil") is the lessee of the building in which the Tri-Star Amoco Food Shop is located and sub-leased the building to Iftikhar Abbasi pursuant to a written lease dated December 1, 1997.
4. Erwin Oil regularly employs three or more employees and is subject to and bound by the Workers' Compensation Act.
5. The following are documents kept in the regular course of business of the Industrial Commission and are part of the record of this case: *Page 3 
 a. Plaintiff's Motion to Allow Pre-hearing Depositions, or, In the Alternative, for a Special Hearing to Preserve the Testimony of plaintiff Akhtar Masood and the Testimony of Navida Masood;
 b. Order Allowing Pre-hearing Depositions of Akhtar Masood and Navida Masood;
 c. Form 61 submitted by defendant-employer;
 d. Plaintiff's Second Amended Form 18, submitted to the Commission on October 3, 2000;
 e. Plaintiff's Amended Form 33, filed with the Commission on October 5, 2000;
 f. Form 33R submitted to the Commission by defendants;
 g. Plaintiff's Notice of Voluntary Dismissal With Prejudice of Iftikhar Abbasi d/b/a Tri-Star Amoco Food Shop, Inc.
6. The following medical records, which were submitted to the Commission at the hearing before the Deputy Commissioner, were admitted into evidence as records maintained in the regular course of activity of the physician or institution identified:
 a. Duke University Medical Center, hospital and surgical records, 8/6/99 — 3/15/00 (350 pages)
 b. Omni Eye Specialists, reports dated 12/17/02 and 8/20/03, record of examination (3 pages)
 c. Vision World, records of examination, 10/28/02 — 7/2/03 (6 pages) *Page 4 
7. At the hearing before the Deputy Commissioner, defendants stipulated that they would not contest plaintiff's testimony with respect to his employment relationship Iftikhar Abbasi d/b/a Tri-Star Amoco Food Shop, Inc.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was 53 years old at the time of the hearing before the Deputy Commissioner. He is married and has four children. He is a native and citizen of Pakistan.
2. In February 1999 plaintiff started to work as a cashier at the Tri-Star Amoco, a gas station and convenience store that was leased and operated by Iftikhar Abbasi (hereinafter, "Abbasi").
3. Plaintiff held his position of cashier at the Tri-Star Amoco from February 1999 through August 6, 1999. Plaintiff worked in the Tri-Star Amoco every day, in the afternoon and evening hours, throughout the course of his employment there. Plaintiff earned $5.75 per hour and worked 3:00 p.m. to 12 midnight Monday through Saturday and 3:00 p.m. to 11:00 p.m. Sundays.
4. Throughout the course of plaintiff's employment there, the Tri-Star Amoco employed three or more employees. Abbasi had no workers' compensation insurance to cover any of these employees.
5. The building which houses the Tri-Star Amoco is owned by Erwin Distribution Company, a sister corporation of Erwin Oil, which owns the gasoline tanks, pumps and other parts of equipment on the premises of the Tri-Star Amoco. Erwin Oil is in the general business *Page 5 
of buying and reselling petroleum products: gasoline, diesel fuel, kerosene, and the like, and is known in the petroleum industry as a jobber dealer. Erwin Oil builds, leases out, and runs gasoline station/convenience stores. As of the time of the hearing before the Deputy Commissioner, Erwin Oil owned 23 gas station/convenience stores. All of these stores sold petroleum products.
6. Some of Erwin Oil's business involves selling gasoline through retail stores owned by Erwin Oil but run by others, and some involves selling gasoline through retail stores that are run directly by Erwin Oil. At all of these stores, employees perform the work of selling gasoline.
7. Erwin Oil has had a relationship with Amoco Oil Company (hereinafter "Amoco") and its successor corporation BP, since 1945. At the time of the injury that is the subject of this case, Erwin Oil had a "Branded Jobber Contract" with Amoco Oil Company.
8. Pursuant to the branded jobber contract, Erwin Oil agreed to "purchase and receive Amoco's currently offered and available branded petroleum products," "offer for sale, or cause to be offered for sale, representative amounts of each grade of Amoco-based gasoline, currently offered to [Erwin Oil], necessary to satisfy public demand," and "use its best efforts to market the Products covered by this Contract."
9. The majority of gasoline purchased by Erwin Oil pursuant to its contract with Amoco is sold to the public through gas stations owned by Erwin Oil and its affiliate corporation. Erwin Oil delivers gasoline to all of the convenience stores it owns, regardless of whether they are operated by Erwin Oil, or by others through contractual agreements.
10. At the time of plaintiff's employment, Erwin Oil had a lease agreement with Abbasi, through which Abbasi would sell gasoline at the Tri-Star Amoco and otherwise operate *Page 6 
the Tri Star-Amoco as a retail store. A primary purpose of the business located at the premises of the Tri Star Amoco is to sell gasoline to the public. Under the terms of the lease, Abbasi was required to "operate the facility open to the public 18 hours per day, 7 days a week."
11. The contract between Erwin Oil and Abbasi is a subcontract whereby Abbasi has undertaken to perform part of the work contracted between Erwin Oil and Amoco, namely, to market and sell gasoline to meet public demand. Erwin Oil is a principal contractor or intermediate contractor, and Abbasi is a subcontractor.
12. Erwin Oil did not obtain from any source a certificate of workers' compensation insurance or self-insurance covering Abbasi or his employees, as required by N.C. Gen. Stat. § 97-19.
13. On August 6, 1999, while he was performing his duties as a cashier at the Tri-Star Amoco, plaintiff was shot in the neck by two armed and masked assailants.
14. Following the shooting, plaintiff was taken by ambulance to the emergency department of Duke University Medical Center. At the emergency department, plaintiff was treated by Dr. Mark W. Sebastian, who practices in the fields of general surgery, critical care, and vascular surgery.
15. In the emergency department, plaintiff's neck was found to be swollen, and he was having difficulty breathing and was losing his ability to breathe. Plaintiff was in distress and began to lose his pulse and suffered cardio-respiratory arrest. A surgical airway was created for plaintiff, and with the help of the emergency department team, plaintiff was revived following his cardiac arrest in the emergency department. He was then found to have a gunshot wound that traversed his neck. Plaintiff was transported to the operating room, where he underwent a neck exploration. *Page 7 
16. During the course of the neck exploration, plaintiff was found to have a tracheal injury, possible esophageal injury, and significant bleeding coming from the right side of his lower neck and near the right clavicle area. In order to stem bleeding coming from plaintiff's neck, Dr. Sebastian resected, or removed, two-thirds of the clavicle bone to get to the veins beneath.
17. The right clavicle bone is an important part of the body which functions to protect the blood vessels running to the arm and to assist in the movement of the arms. Plaintiff has experienced impairment in his strength and ability to lift in his right arm due to the removal of the majority of his clavicle bone.
18. The purpose of the right internal jugular vein in the body is to drain the right side of the head and the brain. Plaintiff's right internal jugular vein was so damaged and the bleeding from it so severe that it was tied off, or ligated, resulting in plaintiff having completely lost the use of the right internal jugular vein.
19. Plaintiff's right subclavian vein was repaired and narrowed. The purpose of the right subclavian vein in the body is to drain the right arm. The narrowing of plaintiff's subclavian vein diminishes drainage efficiency and could possibly allow a blood clot to form.
20. The injury to plaintiff's trachea created a true hole through the cartilaginous rings, which allows for breathing, conducting air to the lungs, and allows for communication through phonation. Plaintiff's trachea has been permanently damaged as a result of the gunshot wound.
21. In the course of performing the formal neck exploration, the sternal *Page 8 
head of the right sternocleidomastoid muscle had to be divided from the clavicle. The clavicular head of the sternocleidomastoid muscle was also divided and was permanently left to hang in the body with no attachment. Both the sternal head of the right sternocleidomastoid muscle and the clavicular head of the right sternocleidomastoid muscle, separate and important parts of the body, assist in turning the head and lifting the right arm.
22. The platysma muscle was also cut from plaintiff's clavicle during the course of the neck exploration. The function of the platysma muscle is to assist in a range of motion of the head, and it is an important part of the body. One-third of this muscle had to be removed during the neck exploration and the remaining muscle was never reattached.
23. The cutting of the sternal head and clavicular head of plaintiff's sternocleidomastoid muscle and his platysma muscle resulted in scarring in each muscle that contributes to a loss of function and in reduced ability to move the head and neck.
24. Plaintiff also sustained damage to the vocal cords lying within the trachea. Plaintiff was found to have paralysis of the right vocal cord and weakening of the left vocal cord. The purpose of the vocal cords is to protect the airway so that food and other materials do not enter the lungs. Therefore, the vocal cords protect the lungs from aspiration, as well as allow a person to speak.
25. The right and left vocal cords are each important, separate parts of the body. Because of plaintiff's right vocal cord paralysis and left vocal cord weakness, he was at significant risk for aspiration and his ability to phonate was impaired.
26. On November 18, 1999, plaintiff underwent a medialization, in which his right vocal cord was permanently placed in the middle position and injected with Teflon so that the right vocal cord will stay in a permanent place in the middle of plaintiff's trachea, in what would normally be a closed position.
27. As a result, plaintiff's ability to speak and breathe are dependent upon the left vocal cord being able to move. Plaintiff's right vocal cord is permanently damaged, functioning *Page 9 
simply as a barrier, and makes no significant contribution to plaintiff's ability to speak except passively.
28. While plaintiff's progress was remarkable from a physiological standpoint, he was significantly affected from an emotional and cognitive standpoint from his experience. Dr. Sebastian felt that plaintiff appeared quite depressed compared to other patients.
29. From March 1 through March 14, 2000, plaintiff received evaluation and counseling for significant levels of distress, sadness, and fear from Kimberlea Schiro-Osman, Ed.M. of the Duke Psychology Clinic, who diagnosed plaintiff with post-traumatic stress disorder-chronic and major depressive disorder-single episode.
30. Whenever plaintiff eats or drinks he feels tightness in his throat as a result of his vocal cord paralysis. Plaintiff was discharged from the hospital on September 20, 1999, following which date he was treated by an occupational therapist who visited his home on a daily basis. This service also was provided by Duke University Medical Center.
31. For a period of time after his injury, plaintiff was sometimes unable to access his short-term memory in the way that he had prior to his injury, which caused plaintiff to have difficulty in maintaining employment. For example, when he once left a cash register unattended, cash was stolen as a result. However, plaintiff presented no medical evidence that he suffered a permanent injury to brain as a result of the August 6, 1999 incident.
32. Beginning on June 3, 2000, plaintiff became continuously employed on a full time basis.
33. As of the date of the hearing before the Deputy Commissioner, plaintiff was scheduled to leave the United States before October 4, 2003. This was as a result of plaintiff *Page 10 
having voluntarily reported to the United States Immigration and Naturalization Service when required to do so.
34. The treatment provided by Dr. Mark Sebastian and other physicians at Duke University Medical Center was medically necessary for plaintiff.
35. As a result of plaintiff's injury by accident, he has sustained permanent injuries to important internal organs and parts of his body.
36. Plaintiff has sustained permanent injury to his right clavicle, which is an important part of his body for which fair and equitable compensation is the maximum amount allowed of $20,000.00.
37. Plaintiff has sustained permanent loss of his right internal jugular vein, which is an important part of his body for which fair and equitable compensation is the maximum amount allowed of $20,000.00.
38. Plaintiff has sustained permanent damage to his right subclavian vein, which is an important part of his body for which fair and equitable compensation is $10,000.00.
39. Plaintiff has sustained permanent damage to his trachea, which is an important organ or part of his body for which fair and equitable compensation is $10,000.00.
40. Plaintiff has sustained permanent damage to his right vocal cord, which is an important part of his body for which fair and equitable compensation is the maximum amount allowed of $20,000.00.
41. Plaintiff has sustained permanent damage to his left vocal cord, which is an important part of his body for which fair and equitable compensation for the damage to plaintiff's left vocal cord is $10,000.00. *Page 11 
42. Plaintiff has sustained permanent damage to the sternal head of the right sternocleidomastoid muscle, which an important part of his body for which fair and equitable compensation is $5,000.00.
43. Plaintiff has sustained permanent damage to the clavicular head of the right sternocleidomastoid muscle, which is an important part of his body for which fair and equitable compensation is $5,000.00.
44. Plaintiff has sustained permanent damage to the platysma muscle, which is an important part of his body for which fair and equitable compensation is $5,000.00.
45. Plaintiff's medical bills with Duke University Medical Center total $268,777.49. At the time of the hearing before the Deputy Commissioner, these medical bills had not been paid by plaintiff or a third-party insurer.
46. Defendants presented no evidence regarding plaintiff's wage during his employment for Abbasi, for whom he worked less than 52 weeks. Determining plaintiff's average weekly wage by dividing the earnings of plaintiff by the number of weeks and parts therefore during which plaintiff earned wages is a fair and just result to both parties. Plaintiff's average weekly wage is $356.51.
47. Plaintiff settled a third-party civil lawsuit against Abbassi for $45,000.00.
48. In the discretion of the Full Commission, plaintiff is not entitled to an attorney's fee for its defense of defendant's appeal to the Supreme Court.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following: *Page 12 
 CONCLUSIONS OF LAW
1. Plaintiff sustained an injury by accident on August 6, 1999 during the course and scope of his employment with Abbasi, lessee of the Tri-Star Amoco. N.C. Gen. Stat. § 97-2(6). Plaintiff was totally disabled from his compensable injuries from August *Page 13 
6, 1999 through June 2, 2000. N.C. Gen. Stat. § 97-2(9).
2. During the course of plaintiff's employment with the Tri-Star Amoco, Abbasi employed three or more employees, and was subject to the requirements of the Workers' Compensation Act. N.C. Gen. Stat. §97-2(3).
3. As found by the Court of Appeals and left undisturbed by the Supreme Court, Erwin Oil is a principal contractor or intermediate contractor pursuant to N.C. Gen. Stat. § 97-19. Erwin Oil, as a principal or intermediate contractor, failed to obtain from any source a certificate of workers' compensation insurance or self-insurance covering Abbasi or his employees, as required by N.C. Gen. Stat. §97-19.
4. As a principal contractor or intermediate contractor who sublet a contract for the performance of work, defendant Erwin Oil is liable to plaintiff for the payment of workers' compensation benefits for his injury by accident, pursuant to N.C. Gen. Stat. § 97-19.
5. Since the first two methods of calculating plaintiff's average weekly wage pursuant to N.C. Gen. Stat. § 97-2(5) would not be fair and just to both parties, plaintiff's average weekly wage is determined by dividing the earnings during his period of employment, which was less than 52 weeks, by the number of weeks and parts thereof during which plaintiff earned wages. N.C. Gen. Stat. § 97-2(5).
6. As a result of his injury by accident, plaintiff is entitled to the payment of temporary total disability benefits in the amount of $237.69 per week for the period from August 6, 1999 through June 2, 2000, to be pain in a lump sum subject to the attorney's fees approved below. N.C. Gen. Stat. § 97-29. Defendants shall pay interest at eight percent per year from September 10, 2003, when the case was first heard by Deputy Commissioner Hall, as provided by law. N.C. Gen. Stat. § 97-86.2.
7. As a result of his injury by accident, plaintiff has sustained loss of or permanent injuries to important internal organs and parts of his body for which no compensation is payable under any other subdivision of N.C. Gen. Stat. § 97-31. N.C. Gen. Stat. § 97-31(24).
8. Plaintiff is entitled to the payment of $20,000.00 for the permanent loss of his right clavicle. N.C. Gen. Stat. § 97-31(24).
9. Plaintiff is entitled to the payment of $20,000.00 for the permanent loss of his right internal jugular vein. N.C. Gen. Stat. § 97-31(24).
10. Plaintiff is entitled to the payment of $10,000.00 for permanent injury to his right subclavian vein. N.C. Gen. Stat. § 97-31(24).
11. Plaintiff is entitled to the payment of $10,000.00 for permanent injury to his trachea. N.C. Gen. Stat. § 97-31(24).
12. Plaintiff is entitled to the payment of $20,000.00 for permanent injury to his right vocal cord. N.C. Gen. Stat. § 97-31(24).
13. Plaintiff is entitled to the payment of $10,000.00 for permanent injury to his left vocal cord. N.C. Gen. Stat. § 97-31(24).
14. Plaintiff is entitled to the payment of $5,000.00 for the permanent injury of the sternal head of the right sternocleidomastoid muscle. N.C. Gen. Stat. § 97-31(24).
15. Plaintiff is entitled to the payment of $5,000.00 for the permanent injury of the clavicular head of the right sternocleidomastoid muscle. N.C. Gen. Stat. § 97-31(24). *Page 14 
16. Plaintiff is entitled to the payment of $5,000.00 for permanent injury to his platysma muscle. N.C. Gen. Stat. § 97-31(24).
17. Defendants are required to provide plaintiff with reasonable necessary medical treatment related to his compensable injuries that tends to effect a cure, provide relief, or lessen the period of disability. N.C. Gen. Stat. §§ 97-2(19), 97-25, and 97-25.1. Plaintiff's medical expenses, particularly those incurred at Duke University Medical Center, have remained unpaid. Plaintiff has not paid them nor has a third-party health care insurer. Plaintiff is not entitled to interest under N.C. Gen. Stat. § 97-86.2 for any unpaid, outstanding medical expenses as he has not lost the use value of money due to any delay in receiving payment while defendants justifiably contested this claim.See Childress v. Trion, Inc., 125 N.C. App. 588, 481 S.E.2d 697
(1997) (reasoning that a goal of finding that an award of medical compensation is an award under N.C. Gen. Stat. § 97-86.2 is to compensate a plaintiff for loss of the use value of a damage award or compensation for delay in payment). The payment of said interest in the instant case would constitute an unjustified benefit to plaintiff and would be far removed from the goals of the Workers' Compensation Act.Winslow v. Carolina Conference Ass'n, 211 N.C. 571, 191 S.E.2d 403
(1937), See also Lewter v. Abercrombie Enters., 240 N.C. 399,82 S.E.2d 410 (1954). If anyone should receive interest for the unpaid, outstanding medical expenses, it should be the health care provider who has provided the treatment to plaintiff and has failed to receive payment from any source in almost nine years.
18. Pursuant to N.C. Gen. Stat. § 97-10.2(h), "[i]n any proceeding against or settlement with the third party, every party to the claim for compensation shall have a lien to the extent of his interest . . . upon any payment made by the third party by reason of such injury or death." N.C. Gen. Stat. 97-10.2(h). Either party may apply to the superior court for a *Page 15 
determination of the subrogation amount, regardless of whether both parties consented to the third-party settlement. N.C. Gen. Stat. §97-10.2(j). The settled claim filed by plaintiff against Abbassi is a third-party claim. Ales v. T.A. Loving Co., 163 N.C. App. 350, 353,593 S.E.2d 453, 455 (2004). Unless and until plaintiff applies to the superior court for a determination of the subrogation amount, defendants are entitled to a lien on all benefits received by plaintiff from his settlement with Abbasi. See Richardson v. Maxim Healthcare/AllegisGroup ____ N.C. App. ___, ___ S.E.2d ____ (2008).
19. In the discretion of the Full Commission, plaintiff's counsel is not entitled to attorney's fees under N.C. Gen. Stat. § 97-88 for its defense of defendants' appeal to the Supreme Court.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay plaintiff temporary total disability benefits for the period from August 6, 1999 through June 2, 2000 at the rate of $237.69 per week. This amount shall be paid in a lump sum, subject to the attorney's fee approved below. Defendants shall also pay interest at eight percent per year from September 10, 2003, when the case was first heard by Deputy Commissioner Hall, to be paid in full to plaintiff as provided by law and not subject to an attorney's fee.
2. Defendants shall pay to plaintiff the amount of $105,000.00 for the permanent loss of or injury to plaintiff's right clavicle, right internal jugular vein, right subclavian vein, trachea, right vocal cord, left vocal cord, sternal head of the right sternocleidomastoid muscle, *Page 16 
clavicular head of the right sternocleidomastoid muscle, and platysma muscle. The amount owed shall be paid in a lump sum, subject to the attorney's fees approved below. Defendants shall also pay interest ateight percent per year from September 10, 2003, when the case was firstheard by Deputy Commissioner Hall, to be paid in full to plaintiff asprovided by law and not subject to an attorney's fee.
3. Defendants shall pay all medical bills incurred or to be incurred resulting from plaintiff's compensable injuries so long as it tends to effect a cure, give relief, or lessen the period of disability. Inaddition, defendants shall pay to plaintiff interest at eight percentper year from September 10, 2003, when the case was first heard byDeputy Commissioner Hall, only on any out-of-pocket medical expensesincurred by plaintiff, if any, related to plaintiff's compensableinjury.
4. A reasonable attorney's fee of 25% of the compensation due plaintiff under paragraphs 1 and 2 of this Award is approved for plaintiff's counsel and shall be paid as follows: 25% of the lump sum due plaintiff under paragraphs 1 and 2 of this Award shall be deducted from that sum and paid directly to plaintiff's counsel, excluding anyinterest paid under paragraph 1, 2, and/or 3 of this Award.
5. Defendants shall pay the costs.
This is 20th day of May, 2008.
S/___________________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/___________________ BUCK LATTIMORE COMMISSIONER
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER *Page 1